IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Crim. No.** |
| v. | **18 U.S.C. § 201 Bribery of a Public Official** |
| **MOHAMMAD EZAZUL HOQUE** | **FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Ada Bennett, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of a criminal complaint and an application for the issuance of an arrest warrant for MOHAMMAD EZAZUL HOQUE. HOQUE is a naturalized United States citizen with a date of birth of 2/1/1963. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested arrest warrant, and does not include all of my knowledge about this matter. I have set forth only the facts that I believe are necessary to establish probable cause to arrest and charge HOQUE with bribery of a public official in violation of 18 U.S.C. § 201.

2.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been assigned to the District of Columbia Public Corruption Squad in the Washington Division of the FBI since February 2018. My primary responsibilities include conducting and assisting with investigations involving public corruption, fraud, and other related violations of federal criminal law. Prior to my time at the FBI, I acquired approximately ten years of legal experience, practicing as an attorney in a variety of legal fields. I received a Juris Doctorate from the Sandra Day

O'Connor College of Law at Arizona State University in 2008, and formal legal training at the UCL Faculty of Laws at University College of London in 2005.

## PROBABLE CAUSE

3.      The evidence gathered during the course of this investigation establishes probable cause that between 2015 and 2016, HOQUE corruptly offered, gave, and promised things of value, directly and indirectly, to a government official, then Chief of Collections of the District of Columbia Office of Tax and Revenue ("OTR") identified in this affidavit as OTR OFFICIAL, intending to influence OTR OFFICIAL in the performance of an official act, and intending to induce OTR OFFICIAL to act in violation of his lawful duty.

## RELEVANT INDIVIDUALS AND ENTITIES

4.      OTR is responsible for promptly collecting the proper amount of tax from all persons who have not filed tax returns and/or paid tax as required by the District of Columbia, including but not limited to individual income taxes, business taxes, and an array of business-related fees and surcharges.  For businesses, OTR determines the type(s) of taxes that a company must file based upon business registration forms submitted to OTR and to the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA").  DCRA's Corporations Division serves as the Office of Corporate Registrar for the District of Columbia.  The Corporations Division registers all entities that conduct business in the District of Columbia.

5.      Businesses that must file sales and use taxes can file monthly, quarterly, or annually.  The filing frequency is determined by the amount of revenue generated by the business. For monthly sales and use taxpayers, the taxpayer files and pays a percentage of the gross sales. The percentage paid is determined by the type of sale.  For example, food and alcohol served or prepared at restaurants are taxed at ten percent; therefore, ten percent of the gross receipts for the

month are remitted to the District of Columbia. The taxpayer prepares a return that reflects the gross receipts and taxes due, and remits the return and amount due by the 20th of the subsequent month.

6. If the taxpayer files and pays the amount due on time, no further action is required. If the taxpayer files and does not pay the amount due, the Integrated Tax System (ITS), a computer database used by OTR to manage taxpayer accounts, automatically generates liability notices and mails them to the taxpayer. If the taxpayer does not pay the balance after receiving multiple liability notices from the ITS, OTR's Collections Division is notified of the deficiency.

7. After the Collections Division is notified of a deficiency, a Revenue Officer may be assigned. Revenue Officers in the Collections Division are responsible for collecting delinquent accounts and securing delinquent tax returns in accordance with OTR's guidelines. The assigned Revenue Officer will make contact with the taxpayer by phone and/or in person to request payment for the specific delinquent tax period identified in the liability notice. The Revenue Officer may take graduated collection steps including but not limited to liens, levies, garnishments, and with supervisory approval, payment agreements.

8. MOHAMMAD HOQUE, MD, works as a gastroenterologist in Washington, D.C. HOQUE owns Washington Gastroenterology PLLC, as well as multiple restaurants in Washington, D.C. HOQUE's business portfolio includes, but is not limited to: (i) Alabama Avenue Subway, located at 2861 Alabama Avenue, SE, Washington, D.C.; (ii) Minnesota Avenue Subway, located at 3950 Minnesota Avenue, SE, Washington, D.C.; (iii) Georgia Avenue Subway, located at 2301-B Georgia Avenue, NW, Washington, D.C.; (iv) U Street Subway, located at 2001 14th Street NW, Washington, D.C.; (v) 14th Street Eatery, also located at 2001 14th Street NW, Washington, D.C.; and (vi) Ruman Tika Enterprises, also located at 2001 14th Street NW,

Washington, D.C. ("HOQUE's Businesses"). As of September 10, 2020, HOQUE's cumulative tax liability for these businesses was approximately $1,121,857.55.

9. A public official ("OTR OFFICIAL") served as the Chief of the Collections Division within OTR from approximately August 2, 2010, to July 20, 2017. OTR OFFICIAL was terminated from OTR employment on July 20, 2017.

10. A private citizen ("INTERMEDIARY") operates a consulting firm and is a self-employed expediter engaged in obtaining various permits and licenses from the D.C. government for his clients.

### FACTUAL SUMMARY[1]

11. Based on the investigation to date, your affiant believes that beginning in late 2015, until OTR OFFICIAL's termination from OTR in July 2017, OTR OFFICIAL, INTERMEDIARY, and HOQUE engaged in a bribery scheme in which HOQUE, through INTERMEDIARY, paid OTR OFFICIAL bribes to induce OTR OFFICIAL to use his position as Chief of Collections within OTR to fraudulently reduce HOQUE's liability and/or eliminate liens placed, or scheduled to be placed, on HOQUE's Businesses. This scheme included bribes that HOQUE paid OTR OFFICIAL—through INTERMEDIARY—to eliminate HOQUE's outstanding tax liability for his businesses, including but not limited to 14th Street Eatery.

#### *HOQUE's Admissions Concerning the Bribery Scheme*

12. On September 9, 2020, the Fairfax County Police Department (FCPD) executed a Commonwealth of Virginia search warrant at HOQUE'S home in an investigation unrelated to the allegations contained in this affidavit. During the warrant's execution, HOQUE agreed to participate in a voluntary interview with FCPD Detective Robert Barnes and your affiant. HOQUE

---

[1] All events described in this affidavit took place on or about the date specified.

4

was informed that he was not under arrest and that he was free to terminate the interview at any time.

13. During the interview, HOQUE admitted, among other things, that in or about late 2015, HOQUE's 14th Street Eatery had significant tax liabilities. OTR records indicate that HOQUE owed approximately $145,000 to OTR at that time. HOQUE was interested in selling the establishment, but could not do so until the outstanding liabilities were resolved. Accordingly, HOQUE engaged INTERMEDIARY and began to pay bribes to OTR OFFICIAL through INTERMEDIARY to eliminate or stave off consequences for the outstanding liabilities.

14. Specifically, HOQUE admitted to paying both OTR OFFICIAL and INTERMEDIARY to put his tax liability on "hold." HOQUE admitted that when he paid OTR OFFICIAL and INTERMEDIARY, he did so knowing that OTR OFFICIAL and INTERMEDIARY would keep HOQUE's money, and that HOQUE's money would not be remitted to OTR to resolve his tax debt.

15. HOQUE admitted to paying OTR OFFICIAL in cash as well as by check. HOQUE made these payments to OTR OFFICIAL believing that OTR OFFICIAL could "help" him hold or freeze his tax debt to avoid liens on HOQUE's businesses. HOQUE denied believing that OTR OFFICIAL could "wipe out" HOQUE's tax debt.

16. In total, HOQUE estimated that he paid OTR OFFICIAL $45,000 in cash with the expectation that OTR OFFICIAL would use his position at OTR to avoid liens on HOQUE's businesses.

### *OTR Records and Interview of OTR EMPLOYEE*

17. On March 12, 2020, your affiant interviewed the OTR Revenue Officer assigned to HOQUE's accounts in or about 2015 and 2016 ("OTR Revenue Officer"). The OTR Revenue

Officer's responsibilities included attempting to collect on outstanding liabilities owed by HOQUE's Businesses, and levying liens against those businesses if HOQUE remained delinquent. Through the interview of OTR Revenue Officer, your affiant learned of several instances in which OTR OFFICIAL overrode normal OTR procedures to delay liens or eliminate liabilities affecting HOQUE's Businesses.

18.     OTR records reflect that on December 4, 2015, OTR Revenue Officer entered a note into ITS regarding HOQUE stating, in part, "Before I visited the service center [taxpayer] had already talked to [OTR OFFICIAL] who accepted payment.  I don't think that [OTR OFFICIAL] is aware of the other Subway cases that have involvement with this case.  I will brief [OTR OFFICIAL.]"

19.     In his interview, OTR Revenue Officer explained that this note meant that HOQUE and OTR OFFICIAL had been communicating directly.  In addition, OTR Revenue Officer believed OTR OFFICIAL was unaware of the full magnitude of HOQUE's businesses' debt due to the low balance OTR OFFICIAL had calculated for HOQUE.

20.     OTR records indicate that on March 3, 2016, OTR Revenue Officer entered a note into ITS regarding HOQUE that stated, "Received directive from [OTR OFFICIAL] to prepare payment agreement for all four cases with a current cumulative amount due of $266,000.00 to be paid @ $22,166.66 monthly over 12 months." In his interview, OTR Revenue Officer explained that he viewed the payment plan that OTR OFFICIAL had directed as suspicious. OTR Revenue Officer added that the speed with which HOQUE received a payment plan was unusual, and that proper channels had not been followed.  OTR Revenue Officer explained that OTR OFFICIAL did not follow protocol when he directed that HOQUE be put on a payment plan, as that determination was to be made by the Revenue Officer assigned to the accounts.

6

21. On April 28, 2016, OTR received a check in the amount of $15,000 from the potential buyer of 14th Street Eatery on the contingency that OTR issue a Clean Hands Certificate[2] and release all liens against 14th Street Eatery.

22. OTR records show that on May 6, 2016, OTR Revenue Officer entered a note into ITS regarding HOQUE that stated, "Received directive from [OTR OFFICIAL] to release the lien on this case." In his interview, OTR Revenue Officer explained that under normal OTR protocols, the lien on the 14th Street Eatery should not have been released until the full liability was paid. Moreover, OTR Revenue Officer remained concerned that $266,166 was too low given the multiple businesses involved.

### *Relevant Text Message Communications*

23. Text messages recovered from the mobile phones of INTERMEDIARY and OTR OFFICIAL provide further evidence of the bribery scheme.

24. A search of INTERMEDIARY's phone revealed text message communications between INTERMEDIARY and HOQUE about sharing tax money with OTR OFFICIAL during the time period in which OTR OFFICIAL was intervening on HOQUE's behalf at OTR. For example:

   a. On February 9, 2016, at 2:18 a.m., HOQUE wrote INTERMEDIARY, "I will be always careful to save you." Approximately one minute later, HOQUE wrote, "Bc if you go to jail then I will go to jail I know that ::)" and, "So both will be in jail ::)"

   b. On March 23, 2016, at 2:30 a.m., INTERMEDIARY wrote to HOQUE, "You are a

---

[2] The District Columbia Clean Hands Law provides that an applicant for a license or permit cannot owe more than $100 to the District government. A Clean Hands certificate provided by OTR to a business reflects that it owes less than $100. Businesses in the District of Columbia often need a Clean Hands certificate from OTR to obtain permits from other D.C. government agencies.

7

thief in the eye of the law I don't need to proof that ppl who don't pay delays and us tax for 5 business that's a crime you will punish for so stop your Mickey mode shit and face the realty you are a thief[.]"

c. On March 24, 2016, at 8:58 p.m., HOQUE wrote INTERMEDIARY, "You. Ur wife. [OTR OFFICIAL] and me and my wife can share those money[.]"

d. On April 4, 2016, at 9:00 p.m., HOQUE wrote INTERMEDIARY, in part, "U emailed my lawyer and told that I did fraud[.]"

e. On April 11, 2016, at 8:49 p.m., INTERMEDIARY wrote HOQUE, "Man I will talk tomorrow but ur lawyer can put both of us in trouble[.]"

f. On April 14, 2016, at 1:09 p.m., INTERMEDIARY wrote HOQUE, "Waiting for the news ur lawyers make them believe that you have 50.000 to give[.]" Later, at 8:23 p.m., HOQUE wrote INTERMEDIARY, "No news means jail?"

g. On April 24, 2016, at 4:00 p.m., HOQUE wrote INTERMEDIARY, "Can you and me and [OTR OFFICIAL] split money of tax 15000 tomorrow ???"

h. On April 22, 2016, at 4:01 p.m., HOQUE wrote INTERMEDIARY, "Boss Can we split all my paid tax money you and me and [OTR OFFICIAL]?"

i. On April 28, 2016, at 10:03 a.m.—the same day that OTR received a check in the amount of $15,000 from the potential buyer of 14th Street Eatery—INTERMEDIARY wrote HOQUE, "The check just hit the tax office as we speak[.]" At 1:17 p.m., HOQUE wrote INTERMEDIARY, "Can we split that 15000 u and me and [OTR OFFICIAL]??"

j. On May 13, 2016, at 7:43 p.m., HOQUE wrote INTERMEDIARY, "[j]ust let you know I will never overtake you to talk to [OTR OFFICIAL.] Any work related to tax I will

8

defiantly go through you." At 7:45 p.m., HOQUE promised INTERMEDIARY to "[n]ever ever ever talk directly to [OTR OFFICIAL.] It has to go through you so we can share together and enjoy those I never expect that so you and me share 50/50."

k.  On June 6, 2016, at 11:28 a.m., HOQUE wrote INTERMEDIARY, "We need to get out of this country boss" and at 11:29 a.m., "I think I have to leave this country asap[.]"

l.  On June 9, 2016, at 9:28 a.m., INTERMEDIARY wrote to HOQUE, "I will not hold ur case any more you are stupid criminal[.]" At 9:29 a.m., HOQUE wrote INTERMEDIARY, "No further illegal works in life[.]" At 9:51 a.m., INTERMEDIARY sent HOQUE pictures of OTR tax documents with a message that read, "All the doucoument to prove you are con and criminal here[.]"

25.  Your affiant believes that in these exchanges, INTERMEDIARY and HOQUE were openly discussing their criminal conduct, including the fact that HOQUE had not paid his taxes ("ppl who don't pay delays and us tax for 5 business that's a crime"); that INTERMEDIARY and HOQUE were providing OTR OFFICIAL with kickbacks (repeated references to splitting money intended for taxes with OTR OFFICIAL); and that after an apparent falling out, INTERMEDIARY threatened to expose HOQUE's criminal conduct ("All the doucoument to prove you are con and criminal here").

26.  Furthermore, text messages recovered from OTR OFFICIAL's phone demonstrate that, after OTR OFFICIAL was terminated from OTR, HOQUE expressed frustration that OTR OFFICIAL had not permanently solved HOQUE's tax problems in exchange for the bribes HOQUE had paid him. For example:

a.  On August 25, 2018, at 1:04 p.m., HOQUE wrote to OTR OFFICIAL, "U told me u blocked the account so no one can get access." OTR OFFICIAL responded four

9

minutes later, "Yes. But I was out of town when they pulled the account. Please don't panic or play the blame game. It will be ok."

b. On October 10, 2018, HOQUE wrote to OTR OFFICIAL, "I calculated all money I gave you without any results. . . . It's a lot of money I gave you. It's more than 45000. I thought u solved everything."

27. Your affiant believes that these references demonstrate that HOQUE believed that he had paid OTR OFFICIAL more than $45,000 in bribes so that OTR OFFICIAL would take official action or act in violation of his official duty to fraudulently reduce or eliminate HOQUE's debts ("U told me u blocked the account" and "I thought u solved everything").

### *Additional Payments from HOQUE to OTR OFFICIAL*

28. The investigation has revealed that as of August 2018, at least one of HOQUE's Businesses was under threat of closure by OTR. Despite having been terminated from his employment with OTR, OTR OFFICIAL continued to accept payments from HOQUE in the form of checks from bank accounts associated with HOQUE and/or his entities, including the following:

a. On September 11, 2017, a check from Georgetown Eatery, Inc. (a business owned by HOQUE) was issued to OTR OFFICIAL for $2,000.

b. On September 15, 2017, a check was issued to OTR OFFICIAL for $2,000 from an account co-owned by HOQUE.

c. On May 22, 2018, a check from Washington Gastroenterology (HOQUE's medical practice) was issued to OTR OFFICIAL for $1,000.

d. On June 5, 2018, a check from Washington Gastroenterology was issued to OTR OFFICIAL for $500.

e. On June 21, 2018, a check from Washington Gastroenterology was issued to OTR OFFICIAL for $1,000.

10

## CONCLUSION

29. Based on the foregoing, I respectfully submit that probable cause exists to believe that MOHAMMAD EZAZUL HOQUE committed the offense of Bribery of a Public Official in violation of 18 U.S.C. § 201. Therefore, I respectfully request that a criminal complaint and arrest warrant be issued for MOHAMMAD EZAZUL HOQUE.

Respectfully submitted,

ADA BENNETT
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on October 8, 2020.

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE